**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HILTON KARRIEM MINCY,** | : | **CIVIL ACTION NO. 1:08-CV-0507** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **WARDEN DEPARLOS, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Hilton Karriem Mincy ("Mincy"), a state inmate presently in the custody of the Pennsylvania Department of Corrections ("DOC"), and formerly housed at the Lycoming County Prison ("LCP"), Pennsylvania, commenced this civil rights action on March 20, 2008. (Doc. 1). The matter is proceeding *via* an amended complaint. (Doc. 24.) Presently ripe for disposition are cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docs. 57, 74.) For the reasons set forth below, Mincy's motion (Doc. 74) will be denied and defendants' motion (Doc. 57) will be granted.

## I.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, the movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a).[1]  In pertinent part, parties moving for, or opposing, summary

judgment must support their position by "citing to particular parts of materials in

the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P.

56(c)(1)(A).  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor." Colwell v. Rite-Aid Corp., 602 F.3d 495, 501

(3d Cir. 2010) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

## II.  **Statement of Facts**

With the above standard of review in mind, the following are the facts

material to the cross motions for summary judgment.

Mincy came into the custody of the Pennsylvania Department of Corrections

on September 28, 1998, to serve a sentence of seventeen to forty years incarceration.

(Doc. 58, ¶ 10; Doc. 88, ¶ 10.)  During the following dates, he was temporarily housed

---

[1]Rule 56 was revised by amendment effective December 1, 2010.  The revisions are "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts."  Rule 56 advisory committee notes.  "The standard for granting summary judgment remains unchanged," and "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases."  Id.  The post-2010 Amendment Rule 56 provisions will be applied in the matter *sub judice*, as the Supreme Court has directed that the 2010 Amendments are to be retroactively applied.  See Order of the Supreme Court of the United States accompanying Letters from Chief Justice John G. Roberts, Jr., to Speaker of the House Nancy Pelosi and President of the Senate Joseph R. Biden, Jr. (Apr. 28, 2010).

at LCP in relation to pending appearls or petitions for post conviction relief: September 21, 2007 to October 8, 2007; March 19, 2008 to April 11, 2008; June 10, 2008 to June 17, 2008; and August 6, 2008 to August 18, 2008.  (Doc. 58, ¶¶ 11, 13; Doc. 88, ¶ 11, 13.)  In 2007, he was examined by the medical department and represented that he was not taking any prescription medication for seasonal allergies, but, rather, purchased allergy medication from the commissary at the state correctional institution from which he was transferred.  (Doc. 75, ¶¶ 5-6.) Mincy's religious classification is documented as Muslim at LCP.  (Doc. 75, ¶ 68; Doc. 75, ¶ 68.)  Although he has not been incarcerated there since August 18, 2008, he represents that he is still pursing mandamus and habeas corpus relief in the Court of Common Pleas of Lycoming County.  (Doc. 58, ¶¶ 12-14; Doc. 88, ¶¶ 12-14.)

The Lycoming County Prison Board is statutorily created by 61 P.S. 401 and is made up of the following seven members: the President Judge; the District Attorney; the three County Commissioners; the Sheriff; and the County Controller. (Doc. 58, ¶ 15; Doc. 88, ¶ 15.)  The day-to-day decisions and most policy decisions are delegated to the prison administration, which consists of Deputy Warden Steven Blank ("Blank"), Deputy Warden of Treatment Timothy Mahoney (Mahoney), and Warden Kevin Deparlos ("Deparlos").  (Doc. 58, ¶ 16; Doc. 88, ¶ 16.)  Decisions concerning inmates' observations of religious holidays, services and special events are made by the prison administration without direct input from, or involvement of, the prison board.  (Doc. 58, ¶ 17.)  The prison board has never passed a policy or put in place a procedure addressing accommodating inmates' observation of religious

3

holidays, services or special events.  (Id. at ¶ 18.)  Decisions relative to

accommodating inmates' observation of religious holidays, services and special

events are governed by security concerns and the operational needs of the prison.

(Doc. 58, ¶ 19; Doc. 88, ¶ 19.)

## A.    Religious Services

The volunteer prison chaplain, Andy France ("Chaplain France"),

coordinates religious services and volunteers to perform those services.  (Doc. 58,

¶ 29; Doc. 88, ¶ 29.)  Inmates are required to send requests to attend a religious

service or meeting to Chaplain France within one week of the service.  (Doc. 75,

¶ 105; Doc. 75-6, at 3, ¶ 22.)  According to Warden Deparlos, the procedure is as

follows:

> For all religious services and meetings of all denominations:
> Inmates are required to send requests to attend a religious
> service or meeting to the Prison Chaplain, Father Andy
> France, within one week of the service.  Chaplain France
> creates a list of inmates for each of the religious services
> based on the requests he received.  This process is required
> of all inmates who desire to attend a religious service or
> meeting including the Friday, Jumah religious services,
> weekend Christian religious services, and Catholic religious
> services.

(Doc. 88-2, ¶ 22.)

LCP administration has worked with Muslim leader Imam Abdul Pathan ("Imam Pathan") since approximately 2000 to provide Muslim religious services for Muslim inmates.[2] (Doc. 58, ¶ 20; Doc. 88, ¶ 20.) Imam Pathan, a full-time professor at a local college, provides the prison administration with guidance relative to the Muslim religion, beliefs, customs, and requirements. (Doc. 58, at ¶¶ 23-26.) Mandatory Muslim Jumah service is conducted on Fridays. (Doc. 58, ¶ 21; (Doc. 88, ¶ 21.) Talim services, which are Quran studies, are also offered. (Doc. 58, ¶ 22; Doc. 88 ¶ 22.) Although Imam Pathan regularly holds Friday Jumah services, there are times when there are no community volunteers available to perform the Talim services. (Doc. 58, ¶ 82; Doc. 88, ¶ 82.)

There are also times when inmates are not permitted to attend religious services because of the security concerns or operational needs. (Doc. 58, ¶ 83; Doc. 88, ¶ 83.) Security concerns include new inmates who are in Administrative detention awaiting classification; inmates in Disciplinary detention or in the Special Management Unit for reasons of discipline, health or suicide watch; inmates who are required to be segregated from certain other inmates because they are of different gang affiliation, co-defendants, potential witnesses against other inmates, informants or perceived informants; and those inmates who have threatened or carried out violence against other inmates (collectively called Separations). (Doc. 58, ¶ 84; Doc. 88, ¶ 84.) Operational needs include inmate compliance with sign-up

---

[2]An Imam is a Muslim worshiper who leads the recitation of prayer when two or more worshipers are present. See www.thefreedictionary.com/Imam

requirements to attend religious services; availability of volunteers from the community such as Ministers, Priests and Imams to conduct religious services; availability of the multi-purpose room where all religious services are conducted; and operational flow of the Prison as all religious services would be terminated or prohibited during a lock-down of the Prison. (Doc. 58, ¶ 85; Doc. 88, ¶ 85.) For instance, because Mincy had just been recommitted to LCP on March 19, 2008, and he was not on the list of inmates who requested to attend Jumah created by the chaplain, he was not able to attend Jumah service on March 21, 2008. (Doc. 75, ¶ 74; Doc. 90, ¶ 74.) He sent a request slip on March 25, 2008, and was permitted to attend Jumah services thereafter. (Doc. 75, ¶ 75; Doc. 90, ¶ 75.) Mincy adds that while there is a "sign-up sheet for Church Services," Muslim inmates are made to send request slips to staff to attend Islamic services. (Doc. 88, ¶ 85.) Defendants represent that the security and operational restrictions imposed are applicable to all religious services/observations including Christians and Muslims. (Doc. 58, ¶ 87.) Mincy does not believe this to be the case. (Doc. 88, ¶ 87.)

**B.    Meal Service**

Inmates are  required to send a request slip to Chaplain France if they want to participate in the Ramadan fast. (Doc. 58, ¶ 30; Doc. 88; ¶ 30.) He then confirms that the inmates have listed their religion as Muslim upon commitment to LCP, or submitted a change of religious preference form indicating that their preferred religion is Muslim. (Doc. 58, ¶ 31; Doc. 88, ¶ 31.) A list of those inmates who are eligible to participate in the Ramadan fast is generated and provided to Mahoney

and Blank.  (Id.)  The deputy wardens then communicate this information to LCP

Food Service Supervisor, Robert Pulizzi ("Pulizzi"), a certified Serve-Safe Food

Handler who understands and implements proper food preparation, handling and

storage.  (Doc. 58, ¶¶ 32-33; Doc. 88, ¶ 32.)  Pulizzi also receives a list from either

Blank or Mahoney, prepared by Imam Pathan, which states the times each day

when the fast is to begin and end.  (Doc. 58, ¶¶ 42-43, 86; Doc. 88, ¶¶ 42-43, 86.)

Each year, Pulizzi prepares breakfast, lunch and dinner menus for a six-week

period.  (Id. at ¶ 34.)  Pulizzi submits the six-week menus to Susan Browning

("Browning"), a Registered Dietician employed full time at Susquehanna Health

Systems, to review for nutritional balance and caloric intake.  (Id. at ¶ 35.)  Once

Browning certifies the menus for nutritional balance and caloric intake, Pulizzi

implements the menus on a rotating six-week cycle throughout the year.  (Id. at

¶ 36.)  There are holidays throughout the year when LCP deviates from the

six-week menus and serves a different menu such as Memorial Day; Fourth of July;

Labor Day; Easter; Thanksgiving; Christmas; New Years Day; and beginning in

2008, a special menu at the conclusion of Ramadan to accommodate the Ramadan

Feast.  (Doc. 58, ¶ 37; Doc. 75, ¶¶ 92-95, 98; Doc. 90, ¶¶ 92-95, 98.)

Imam Pathan provides prison administration with the dates for the Holy

Month of Ramadan each year and the daily fasting times as they differ slightly from

day to day.  (Doc. 58, ¶ 27; Doc. 88, ¶ 27.)  In 2007, breakfast was prepared between

5:15 a.m. and 6:40 a.m.  (Doc. 58, ¶ 38; Doc. 88, ¶ 38.)  During the month of Ramadan,

it was prepared between 4:30 a.m. and 5:15 a.m., depending on when the daily fast

begins.  (Doc. 58, ¶ 39; Doc. 88, ¶ 39.)  Inmates observing Ramadan were served breakfast between 5:00 a.m. and 5:45 a.m. , depending on when they begin observing the fast that day.  (Doc. 58, ¶ 40; Doc. 88, ¶ 40.)  Inmates not observing Ramadan were served breakfast beginning at 7:15 a.m.  (Doc. 58, ¶ 41; Doc. 88, ¶ 41.)

In 2007 the dinner meals were prepared between noon and 3:40 p.m.  (Doc. 58, ¶ 54; Doc. 88, ¶ 54.)  In 2007 and 2008, the dinner meals for inmates not observing Ramadan were normally served in the blocks beginning at 4:20 p.m.  (Doc. 58, ¶ 55; Doc. 88, ¶ 55.)  The dinner meals for inmates observing Ramadan were kept in warming trays until between 6:00 p.m. and 6:30 p.m.; reheated thoroughly, dished into Styrofoam containers, placed on a cart, and served to those inmates once the fast was over that evening.  (Doc. 58, ¶ 56.)  Pulizzi, was of the opinion that the Styrofoam containers would keep the food warm until the conclusion of the Ramadan fast at night.  (Doc. 90,  ¶ 81.)  It is conceded, however, that kitchen staff did not test the food temperatures prior to serving the meals.  (Doc. 75, ¶ 81; Doc. 90, ¶ 81.)  Beginning in 2008, the dinner meals for inmates observing Ramadan were kept warm by placing them in warming units called cambro units.[3]  (Doc. 75, ¶ 99; Doc. 90, ¶ 90.)  The prison kitchen is secured and closed each evening by 6:30 p.m. (Doc. 58, ¶ 59; Doc. 88, ¶ 59.)

_____

[3]Cambro warming units are insulated food and beverage transport units.  <u>See</u> www.cambro.com

The Sunday lunch is traditionally a hot meal and dinner is "Chef's Choice." (Doc. 75, ¶ 89; Doc. 90, ¶ 89.) Those inmates observing Ramadan were served the hot lunch meal as their dinner meal. (Doc. 75, ¶ 91; Doc. 90, ¶ 91.)

In 2007, Ramadan was observed from September 13, 2007 until October 13, 2007, and in 2008, it was observed from September 1, 2008 until October 1, 2008. (Doc. 58, ¶¶ 88-89; Doc. 88, ¶¶ 88-89.) Mincy was incarcerated at LCP during part of Ramadan in 2007, September 21, 2007 until October 8, 2007. (Doc. 58, ¶ 90; Doc. 88, ¶ 90.)[4] On September 24, 2007, during Ramadan, Blank received a grievance from Mincy complaining that he was not receiving enough food. (Doc. 58, ¶ 45; Doc. 75, ¶ 34; Doc. 88, ¶ 45; Doc. 90, ¶ 34.) As a direct result of the grievance, Blank inquired of Pulizzi how the inmates are compensated nutritionally and calorically during the month of Ramadan since they do not eat lunch. (Doc. 58, ¶ 46.) Pulizzi advised that the inmates observing the Ramadan fast were served additional food at breakfast and at dinner in order to compensate for missing lunch. (Id. at ¶ 47.) Specifically, he supplied inmates observing Ramadan with one and one-half the amount of food normally served for breakfast and dinner. (Id. at ¶ 48.) Pulizzi advised Blank that the inmates observing Ramadan were receiving sufficient nutrition and sufficient calories in 2007 and 2008 as a result of the increased serving amount at breakfast and dinner. (Id. at ¶ 52.) Even though the inmates observing Ramadan were being adequately fed, Blank authorized Pulizzi to put an additional

---

[4]He was not incarcerated at LCP during Ramadan in 2008. (Doc. 58, ¶ 91; Doc. 88, ¶ 91.)

piece of fruit on the breakfast trays of inmates observing Ramadan in order to

address Mincy's perception that he was not being adequately fed. (Id. at ¶ 53; Doc.

75, ¶ 56; Doc. 90, ¶ 56.) Based on the request of Imam Pathan, a feast was held at

the conclusion of Ramadan in 2008 and 2009 for those Muslim inmates participating

in Ramadan. (Doc. 58, ¶¶ 28, 69; Doc. 88 ¶ 69.) According to Mincy, prior to this

time, prison administration had ignored requests for such a feast. (Doc. 88, ¶ 28.)

He also states that his request to take allergy medication before and after the

Ramadan fast was denied. (Doc. 75, ¶ 9.)

### C.    Distribution of Religious Materials/Religious Holidays

LCP does not purchase or distribute Bibles, Qurans or other religious

materials. (Doc. 58, ¶ 62; Doc. 88, ¶ 62.) Rather, the prison relies on contributions

from religious institutions and organizations. (Doc. 58, ¶ 62; Doc. 88, ¶ 62.) After the

donated materials pass a security screening, they are distributed to inmates by the

religious volunteers. (Doc. 58, ¶ 63; Doc. 88, ¶ 63.) Typically, LCP has several

churches or religious organizations which donate Bibles and, thus, Bibles are

readily available to the Christian inmates requesting them. (Doc. 58, ¶ 64; Doc. 88, ¶

64.) Until approximately four years ago, the Saudi Arabian Consulate in New York

City donated Qurans to LCP for Muslim inmates which were plentiful enough to

provide Qurans to all of the Muslim inmates requesting them. (Doc. 58, ¶ 65; Doc.

88, ¶ 65.) Over the past four years, the LCP administration has made several

inquiries of various Muslim organizations to determine if Qurans are available for

donation to the prison Muslim population. (Doc. 58, ¶ 66; Doc. 88, ¶ 66.) Imam

Pathan brings Qurans periodically to the Prison for distribution, but has advised LCP that the local Mosque has limited means, thus, it does not have the funds to supply enough Qurans to distribute to all of the Muslim inmates.  (Doc. 58, ¶ 67; Doc. 88, ¶ 67.)

LCP does not purchase or prepare Christmas bags, Easter candy or religious materials.  (Doc. 58, ¶ 70; Doc. 88, ¶ 70; Doc. 90, ¶ 100.)  Religious institutions and organizations have the option to prepare holiday bags for inmates, and, upon Blank's approval and security clearance, the bags are distributed to all inmates unless security restrictions apply to particular inmates.  (Doc. 58, ¶ 71; Doc. 88, ¶ 71; Doc. 75, ¶ 96; Doc. 90, ¶ 96.)  In recent history the Salvation Army donated Christmas bags to the LCP inmate population.  (Doc. 58, ¶ 72; Doc. 88, ¶ 72.) Likewise, only the Salvation Army donated Easter candy to the inmate population. (Doc. 58, ¶ 73; Doc. 88, ¶ 73.)  LCP has not been approached by a Muslim Mosque or other Muslim institutions or organizations with requests to distribute holiday bags, candy or other materials.  (Doc. 58, ¶ 75; Doc. 88, ¶ 75.)  LCP would have distributed holiday bags, candy or other materials if received from the Muslim Mosques or other Muslim religious institutions or organizations, provided the donated materials passed through security clearance.  (Doc. 58, ¶ 74; Doc. 88, ¶ 74.)  LCP requires any religious institutions or organizations wanting to distribute anything to inmates to provide enough for distribution to all inmates in the Prison to avoid fights, threats, oppression and/or stealing by inmates. (Doc. 58, ¶ 76; Doc. 88, ¶ 76.)

Zakat is a charitable donation encouraged by the Muslim faith which can be accomplished at any time during the year, but which is especially encouraged during Ramadan. (Doc. 58, ¶ 77; Doc. 88, ¶ 77; Doc. 75, ¶ 102; Doc. 90, ¶ 102.) Pursuant to the prison policy outlined in the Inmate Handbook, inmates are not permitted to send money out of their inmate accounts except one time for very limited purposes because there is not sufficient staff to send money from inmate's accounts. (Doc. 58, ¶¶ 78-79; Doc. 88, ¶¶ 78-79; Doc. 75, ¶ 103; Doc. 90, ¶ 103.) In addition, it is a security measure to ensure inmates cannot send money out to former inmates to compensate them for acts while incarcerated for gambling debts; for protection; or for violent acts. (Doc. 58, ¶ 79; Doc. 88, ¶ 79.) LCP policy does not permit Muslim inmates to send money out of their accounts for Zakat, nor for other inmates of other religions to send money to churches or charitable organizations. (Doc. 58, ¶ 80.) Mincy concedes that he had no money in his inmate account while incarcerated at LCP. (Doc. 75, ¶ 2; Doc. 90, ¶ 2.) In lieu of an inmate's monetary contributions, a family member can satisfy a Muslim inmates' obligation to donate money to charity for Zakat. (Doc. 58, ¶ 81.) Mincy takes issue with this policy because it does not provide an alternative in the event that an inmate has a family member who is not Muslim and not inclined to donate to an Islamic organization. (Doc. 88, ¶¶ 80-81.)

### D.    Grievance Procedure

LCP distributes an Inmate Handbook to all inmates upon commitment. (Doc. 58, ¶ 94; Doc. 88, ¶ 94.) The Inmate Handbook in effect in 2007 and 2008

contained procedures relative to filing request slips and grievances. (Doc. 58, ¶ 95; Doc. 88, ¶ 95.) On September 24, 2007, during Ramadan, Blank received a grievance from Mincy complaining that he was not receiving enough food. (Doc. 58, ¶ 45; Doc. 75, ¶ 34; Doc. 88, ¶ 45; Doc. 90, ¶ 34.) On October 8, 2007, Mincy sent a letter to the warden *via* certified mail complaining of Ramadan meals, the lack of a Ramadan Feast, interference with access to Jumah services and other practices and customs of the LCP officers and staff. (Doc. 75, ¶ 65.) On March 27, 2008, Mincy filed a grievance concerning law library privileges, access to religious services from the time he was recommitted to the prison on March 19, 2008; and the copying services process which differed from the process he was accustomed to at the state facility where he was normally housed. (Doc. 58, ¶ 96; Doc. 88, ¶ 96.)

## III. **Discussion**

### A.    **Constitutional Claims**[5]

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

---

[5] Defendants seek an entry of summary judgment on the constitutional claims based on Mincy's failure to fully utilize the administrative review process. (Doc. 60, at 8.) However, because defendants have failed to set forth the steps necessary to exhaust, and the portion of the inmate handbook that governs exhaustion has not been made a part of the record, the argument will not be considered.

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id. In order to state an actionable civil rights claim, a plaintiff must plead two essential elements: (1) that the conduct complained of was committed by a person acting under color of law, and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995);  Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d Cir. 1990).  A civil rights claim cannot be premised on a theory of *respondeat superior*.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).  Rather, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs. . . .  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  Rode, 845 F.2d 1195, 1207-08 (3d Cir. 1988); see also, Rizzo v. Goode, 423 U.S. 362 (1976); Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003).  Individual liability can be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct.  Rode, *supra*.  Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement.  Rode, 845 F.2d at 1208.

It is first noted that the Lycoming County Prison is entitled to an entry of judgment because, a prison or correctional facility is not a "person" within the meaning of § 1983. See Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989); Phippen v. Nish, 223 F. App'x. 191, 192 (3d Cir. 2007). Conversely, the Lycoming County Prison Board, a local government unit, and members Butts, Brewer, Burke, Nassberg, Larson, Rodgers, and Dinges, are among those "persons" to whom Section 1983 applies. Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). While the prison board and its members are not responsible for the acts of those it supervises under a theory of vicarious liability or *respondeat superior*, Monell, 436 U.S. at 691, they are subject to liability to the extent that there exists an unconstitutional custom or policy that caused the alleged constitutional violation. See, e.g., Natale v. Camden County Corr. Facility, 318 F.3d 575, 583-84 (3d Cir.2003).

According to the record, the prison board delegates to the prison administration day-to-day decisions and most policy decisions. (Doc. 58, ¶ 16; Doc. 88, ¶ 16.) For instance, decisions concerning inmates' observations of religious holidays, services and special events are made by the prison administration without direct input from, or involvement of, the prison board. (Doc. 58, ¶ 17.) The prison board has never passed a policy or put in place a procedure addressing the accommodation of inmates' observation of religious holidays, services or special events. (Id. at ¶ 18.) Consequently, the Lycoming County Prison Board and its members are entitled to an entry of summary judgment.

To the extent that Mincy attempts to implicate these defendants based upon any role they would have played in the grievance procedure, or handling of prison complaints, he fares no better. Participation in the after-the-fact review of a grievance or appeal is not enough to establish personal involvement. See Rode, 845 F.2d at 1208 (mere filing of a grievance is not enough to impute the actual knowledge necessary for personal involvement); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to a prison grievance, did not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct); Croom v. Wagner, 2006 WL 2619794, at *4 (E.D. Pa. Sept. 11, 2006) (holding that neither the filing of a grievance nor an appeal of a grievance is sufficient to impose knowledge of any wrongdoing); Ramos v. Pennsylvania Dept. of Corrections, 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) (holding that the review and denial of the grievances and subsequent administrative appeal does not establish personal involvement); Pressley v. Blaine, No. 01-2468, 2006 U.S. Dist. LEXIS 30151, at *17 (W.D. Pa. May 17, 2006) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern." (citing Garfield v. Davis, 566 F. Supp. 1069, 1074 (E.D. Pa. 1983))).

  1. First Amendment

The First Amendment offers protection for a wide variety of expressive activities. See U.S. Const. amend I. These rights are lessened, but not

extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. See Turner, 482 U.S. at 89.

a. *Failure to Accommodate Religion*

Although inmates retain certain protections afforded by the First Amendment, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (quotations omitted). In Shabazz, the Supreme Court determined that prison regulations that allegedly infringe upon an inmate's "religious" rights as protected by the First Amendment must be reviewed under a "reasonableness" test that is less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. Id. Specifically, when a prison rule or practice impinges on inmates' constitutional rights "the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 349.

In determining whether a prison regulation, rule or practice is "reasonably related" the following four factor test is applied: (1) whether there is a "valid, rational connection between the prison regulation, rule or practice and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the

17

availability of "ready alternatives" for furthering the governmental interest.  Turner v. Safley, 482 U.S. 78, 89-90 (1987).

The plaintiff bears the burden of persuasion.  Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (citations omitted) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.")  Moreover, "[w]e must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."  Id.  (collecting cases).  Great deference must also be afforded to prison administrators in the adoption and execution of policies and practices that are necessary to preserve internal order and to maintain institutional security.  Bell v. Wolfish, 441 U.S. 520, 527 (1979).

In Count I of the amended complaint, Mincy argues that defendants have interfered with his right to exercise his beliefs by: "(1) denying hot-meals; (2) denying medication prior to and after fasting times during Ramadan; (3) denying Ramadan feast; (4) interfering with access to (Friday) Jumah religious services; (5) serving lesser portions of food; (6) targeting plaintiff and other Muslim inmates observing Ramadan in order to make fasting a hardship; (7) treating plaintiff and other Muslims unequally, compared to the other inmates whom are Christian or Catholic, with the intentions of discouraging Muslim inmates from continued observance of their religious beliefs and to discourage those whom are not Muslim from pursuing their interest in the faith."  (Doc. 87, at 11-12; Doc. 24, at 3-6.)

18

The evidence of record paints an entirely different picture. LCP administration and the prison chaplain have relied on the expertise of an Imam since approximately 2000 for guidance in accommodating Muslim religion, beliefs, customs and practices. As a result, donations of Qurans are regularly solicited from various Muslim institutions for use by Muslim inmates. Jumah services are conducted on Fridays and community volunteers, when available, perform Talim services. The Muslim holiday of Ramadan is recognized and the prison makes efforts to accommodate the fast. Also recognized is the act of Zakat.

Mincy takes issue with the dining services he was provided during Ramadan in 2007. First, he contends that he was denied hot meals during the Ramadan fast. It is clear that Pulizzi believed that the Styrofoam containers were sufficient to maintain optimum meal temperatures. Although this method may have failed, there is no question that LCP was making efforts to accommodate Muslim inmates. Further, once notified, LCP rectified the problem by switching the warming method to Cambro warming trays. Second, he asserts that he was served a lesser amount of food during the Ramadan fast and that prison administration made fasting a hardship.

Given the lengths to which the prison went to accommodate the Ramadan fast, it is difficult to find even a modicum of support for Mincy's position. For instance, breakfast is typically prepared by the food service department between 5:15 a.m. and 6:40 a.m. During Ramadan, breakfast is prepared between 4:30 a.m. and 5:15 a.m., depending on when the fast begins. Dinner meals are served on the

prison blocks beginning at 4:20 p.m. However, for those observing the Ramadan

fast, meals are thoroughly reheated and placed in warming containers for service

between 6:00 p.m. and 6:30 p.m. In addition, the prison recognizes that the practice

of fasting results in the elimination of the lunch time meal and compensates for it

by increasing the serving portions of the meals served for breakfast and dinner.

This ensures that meals meet the fasting inmates' caloric and nutritional needs.

Muslim inmates observing the Ramadan fast are also given an additional piece of

fruit on their breakfast trays. Also, with respect to his contention that he was

denied a feast at the conclusion of Ramadan, because he was transferred out of

LCP on October 8, 2007, he could not have been denied the feast which would have

occurred on October 13, 2007. Nor could he have been denied a feast at the

conclusion of Ramadan in 2008, as he was not an inmate at LCP during the month

of Ramadan in 2008. Moreover, he could not have been denied access to

medications prior to or at the conclusion of each day of the fast because he was not

prescribed any medications while incarcerated at LCP during Ramadan 2007.

Mincy also complains that he was denied access to Jumah services on Friday,

March 21, 2008, because of the sign-up policy, which is applied unequally to Muslim

inmates. The prison policy to which he is referring requires inmates to send

requests to attend religious services within one week of the service. (Doc. 88-2, ¶

22.) He had just been recommitted to the prison on March 19, 2008, and was

therefore unable to comply with the requirement of signing up to attend religious

services one week in advance. Consequently he was not on the sign-up list created

by the prison chaplain and was prevented from attending the service. The legitimate governmental interest behind the policy is the need to coordinate religious services and volunteers to perform those services. There is clearly a rational connection between requiring inmates to sign up for religious services and achieving orderly operation of the prison and meeting the religious needs of inmates. In addition, the policy is neutral in that the sign up requirement applies to all inmates who seek to attend religious services, not just Muslims.

Mincy also challenges this policy on the grounds that inmates attending Catholic and Christian services are provided with a sign-up sheet placed on the block and are not required to send a request slip. Defendants dispute this statement and maintain that the policy is equally applied to all faiths. The Court finds this dispute immaterial and constitutionally insignificant as neither procedure is burdensome and, consequently, there is simply no impingement on the free exercise of an inmate's religion.

Likewise, Mincy's contention that Muslims are treated differently than Christian and Catholic inmates with respect to the distribution of religious material and holiday donations is unfounded. LCP does not purchase or distribute religious materials. They rely on donations from religious institutions and organizations. LCP does not purchase holiday materials such as Christmas bags or Easter candy. Religious organizations have the option to prepare holiday bags for inmates. Once donated materials pass a screening process, they are approved for distribution to *all*

*inmates*, regardless of religious denomination. Only those inmates with security restrictions are excluded.

Mincy also raises concerns over the ability of Muslims to partake in the act of Zakat, a charitable donation encouraged by the Muslim faith. The prison policy does not permit inmates to send money out of their inmate accounts except for very limited purposes. The rationale behind this policy is twofold. First, LCP cites a shortage of available staff to regularly send money from inmate's accounts. Second, it is a security measure to prevent inmates from sending money to other inmates to compensate them for acts while incarcerated such as gambling debts, protection or violent acts. Undoubtedly, there is a rational connection between the policy, the efficient use of staff, and the need to maintain institutional security. Significantly, Mincy did not have any money in his inmate account during 2007.

For all the above reasons, defendants' motion for summary judgment on the interference with the First Amendment free exercise of religion claim against remaining defendants Deparlos, Blank, Hartly and McKissick will be granted and Mincy's motion will be denied.

b.    *Retaliation for Exercise of Religion*

In Count IV, Mincy alleges that he was retaliated against for exercising his First Amendment rights. The First Amendment offers protection for a wide variety of expressive activities. <u>See</u> U.S. Const. amend I. These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. <u>See</u> <u>Turner v.</u>

Safley, 482 U.S. 78, 89 (1987).  Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment.  See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him."  Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) (quoting Allah, 229 F.3d at 225).  The last Rauser prong requires a prisoner to establish a causal link between the exercise of his constitutional rights and the adverse action taken against him.  The court employs a burden-shifting regime to determine whether a causal link exists.  The prisoner bears the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him or retaliate against him.  See id. (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same disciplinary action even in the absence of the protected activity.  See id.  If defendants prove that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest, they will prevail in the retaliation action.  See id. at 334.

Mincy has failed to oppose defendants' motion for summary judgment on this claim and does include the claim in his motion for summary judgment. Consequently, defendants' motion will be granted as unopposed.

23

## 2. <u>Fourteenth Amendment Equal Protection</u>

We turn to Mincy's denial of equal protection claim outlined in Count III. Therein he alleges that defendants "have in place a "policie" [sic], and/or "practice" and/or custom in which they have intentionally interfered with the Plaintiff and other inmates access to Friday Jumah service; which said "policy", "practice["], or "custom" is in disparity to the favorable treatment Christian and Catholic inmates receive access to their services." (Doc. 24, ¶ 22.) To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated. <u>See</u> <u>City of Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985). As is evident from the free exercise of religion discussion, *supra*, LCP attempts to accommodate Muslims the same as other religious groups and there is no evidence supporting the claim that any of the policies at issue resulted in disparate treatment of religious faiths. As a result his equal protection claim is rejected.

## B. RLUIPA

Section 3 of Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA")provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling interest," and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or

24

not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); see also Cutter v. Wilkinson, 544 U.S. 709, 715 (2005). Mincy's RLUIPA claim can be found in Count II of the amended complaint.

Initially, an inmate must establish that he possesses a sincerely held, authentic religious belief, the exercise of which the government has substantially burdened. See Cutter v. Wilkinson, 544 U.S. 709, 725 n. 13 (2005). He must then demonstrate that his religious exercise has been burdened substantially by the challenged conduct. Washington v. Klem, 497 F.3d 272, 277-78 (3d Cir. 2007). Substantial burden exists where: "1)a follower is forced to choose between following the precepts of his religion and forfeiting the benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." Id. at 280.

If an inmate proves that the government substantially burdened the exercise of a sincerely held religious belief, the burden then shifts to the government. Thereafter, the Court must determine whether the government has demonstrated that the burden was imposed both in furtherance of a compelling government interest and represents the least restrictive means of furthering that compelling government interest. See Washington, 497 F.3d at 282.

In making this determination, the Court is mindful of the fact that " 'context matters' ", Cutter, 544 U.S. at 723 (quoting Grutter v. Bollinger, 539 U.S. 306, 327 (2003)), and gives " 'due deference to the experience and expertise of prison and jail

administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' " Id. (quoting S.Rep.No. 103-111, at 10, U.S.Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900.) Congress indicated that in the event an inmate's request for religious accommodation would "become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." Id. at 726.

Mincy has demonstrated that he possesses a sincerely held, authentic religious belief in practicing his Muslim faith. However, there is no evidence that the exercise of his religious beliefs was substantially burdened. He was afforded the opportunity to attend Jumah services each time he was incarcerated at LCP, provided he complied with the reasonable requirement that he sign up for the service in advance. Talim services were offered when volunteers were available. His seventeen-day period of incarceration in 2007 coincided with the celebration of Ramadan. During that time, LCP accommodated Muslim inmates' observation of the fast. While the restriction placed on monetary distributions from an inmate's account impacts their ability to satisfy the Zakat requirement, this restriction had no effect on Mincy as he had no money in his inmate account to donate. Defendants' motion for summary judgment on the RLUIPA claim will be granted and Mincy's motion will be denied.

### C. State Law Claims

Also included in Counts I and III of the amended complaint are unspecified state law claims against defendants in their individual capacities. (Doc. 24, at ¶¶ 17, 25.) The court declines to exercise supplemental jurisdiction over the pendent state law claims. 28 U.S.C. § 1367(c)(3). They will be dismissed without prejudice to any right Mincy may have to pursue them in state court. In so holding, the court expresses no opinion as to the merits of any such claims.

### D. Pennsylvania Political Subdivision Tort Claims Act

In Count V of the amended complaint, Mincy attempts to bring a claim under the Pennsylvania Political Subdivision Tort Claims Act ("Tort Claims Act"), 42 Pa. Cons. Stat. §§ 8541 <u>et seq</u>. The Tort Claims Act provides municipal employees who are acting within the scope of their employment with immunity from suit "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. §§ 8541, 8545. It is not a cause of action. Defendants seek summary judgment on this count and Mincy does not oppose the motion. Defendants' motion will be granted.

## IV.    Conclusion

Based on the foregoing, plaintiff's motion for summary judgment (Doc. 49)

will be denied and defendants' motion for summary judgment (Doc. 54) will be

granted.

An appropriate order will issue.


_S/ Christopher C. Conner_
CHRISTOPHER C. CONNER
United States District Judge


Dated:       March 24, 2011

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HILTON KARRIEM MINCY,** | : | **CIVIL ACTION NO. 1:08-CV-0507** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **WARDEN DEPARLOS, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 24th day of March, 2011, upon consideration of the cross motions for summary judgment (Docs. 57, 74), and for the reasons set forth in the foregoing memorandum, it is hereby ORDERED that:

1.  Plaintiff's motion for summary judgment (Doc. 74) is DENIED.

2.  Defendants' motion for summary judgment (Doc. 57) is GRANTED and the Clerk of Court is directed to ENTER judgment in favor of defendants and against plaintiff.

3.  The Clerk of Court is further directed to CLOSE this case.

4.  Any appeal from this order is DEEMED frivolous and not in good faith. <u>See</u> 28 U.S.C. § 1915(a)(3).


      <u>S/ Christopher C. Conner</u>
CHRISTOPHER C. CONNER
United States District Judge